**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CAROLYN BARNETT, | ) | |
| Plaintiff, | ) | CASE NO.   1:07-cv-3367 |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | **MEMORANDUM OF OPINION** |
| | ) | |
| Defendant. | ) | |

This case is before the magistrate judge by the consent of the parties.  Plaintiff,

Carolyn Barnett ("Barnett"), challenges the final decision of the Commissioner of Social

Security, Michael J. Astrue ("Commissioner"), denying Barnett's application for a period of

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§

416(i), and for Supplemental Security Income ("SSI") under Title XVI of the Social Security

Act ("Act"), 42 U.S.C. §§ 423 and 1381(a).  This court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).

For the reasons set forth below, the decision of the Commissioner is vacated and

remanded for further action consistent with this opinion.

I.  Procedural History

Barnett filed an applications for DIB and SSI in April 2003, alleging disability as of

December 13, 2002 due to a back injury.  Her applications were denied initially and upon

reconsideration.  Barnett timely requested an administrative hearing.

Administrative Law Judge William J. Hafer ("ALJ") held a hearing on January 4, 2006.  Barnett, represented by counsel, testified on her own behalf at the hearing.  Edward Wood testified as a vocational expert ("VE").  The ALJ issued a decision on June 15, 2006 in which he determined that Barnett is not disabled.  Barnett requested a review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on August 31, 2007, the ALJ's decision became the final decision of the Commissioner.

Barnett filed an appeal to this court on October 30, 2007.  Barnett alleges that the ALJ erred by (1) failing to accord proper weight to the opinion of Barnett's treating physician and (2) conducting a faulty assessment of Barnett's credibility by failing to consider Barnett's documented obesity.  The Commissioner denies that the ALJ erred.

## II.  Evidence

### A.    *Personal and Vocational Evidence*

Barnett was born on March 20, 1949 and was 57 years old at the time of her hearing.  She has a high school equivalency degree and has past work experience as a cook in a fast food restaurant, a job requiring medium exertion.

### B.    *Medical Evidence*

On October 8, 2001, Barnett injured her back at work while moving a cabinet.  She went to the emergency room at Mercy Hospital.  The attending physician found decreased range of motion and muscle spasm in the lumbar region and diagnosed acute myofascial strain.  Transcript ("Tr."), p. 114A.  When she visited her primary physician, Tik Liem, M.D., on October 12, 2001, he ordered an x-ray.  Tr. at 221.  The physician interpreting the x-ray found very mild anterior osteophyte formation at L2-L4 and mild sclerosis involving the

2

posterior elements of the lower lumbar spine.  Tr. at 158.  The x-ray was otherwise normal.  Dr. Liem suggested physical therapy, but Barnett was unable to get time off from work for such therapy.  Dr. Liem also told her that there was not much that a doctor could do for her.

Barnett returned to work but still experienced back pain.  On December 5, 2001, Barnett visited James E. Lundeen, Sr., M.D., a pain specialist, and completed a questionnaire regarding her pain.  Tr at 214-19.   The completed questionnaire noted that she was currently taking Vioxx for her pain and that the relief she received from that medication  was about a four on a ten-point scale (with zero indicating "no relief" and ten indicating "complete relief").  Similarly, on a ten point scale (with zero indicating "does not interfere" and ten indicating "completely interferes"), Barnett recorded that her pain's interference with her general activity was an eight, interference with walking ability was a seven, interference with her normal work routine was a nine, interference with sleep was an eight, interference with enjoyment of life was a nine, interference with ability to concentrate was a two, and interference with appetite was a two.  Barnett also indicated that her pain did not interfere with her mood or relations with other people.  Barnett described her pain as burning, shooting, and penetrating, ranging from six to ten in the last month (with zero indicating "no pain" and ten indicating "worst pain imaginable") and averaging seven.  Barnett wrote that rest and her medicine made her pain feel better while walking, bending, and lifting made it feel worse.

On April 9, 2002, Barnett saw Dr. Lundeen again.  Tr. at 210-212.  Barnett completed a new patient information form on which she described herself as 5 feet one inch tall, weighing 180 pounds, and in generally good health.  She described her current pain as an eight on a ten-point scale.  She also reported that moving or bending increased her

pain while lying down decreased it.  In response to the question, "How has the pain affected your life?," Barnett answered, "I can hardly do anything anymore."  Tr. at 213.  She also reported that the pain had affected her sleep.  Upon examination, Dr. Lundeen found spasms, tenderness, and atrophy in the posterior calf muscles; spasms, tenderness, and atrophy in the posterior thigh muscles; a slow gait; and impaired balance.  He diagnosed lumbar sprain and prescribed Lorcet and Motrin..

Barnett saw Dr. Lundeen again on June 13, September 5, September 30, November 11, and November 27, 2002.  Tr. at 205-09.  Over that time, Barnett reported her symptoms as worsening and that sitting, bending, leaning, lifting, carrying, standing, walking, and balancing were impaired by her condition.  Dr. Lundeen continued to detect spasms, tenderness, and atrophy in the posterior calf muscles, posterior thigh muscles, and anterior thigh muscles and problems with gait and balance.  Dr. Lundeen added Zanaflex to her prescriptions to treat Barnett's muscle spasms.  On November 11, 2002, he prescribed epidural injections.

On September 18, 2002, an MRI of Barnett's lumbar spine revealed mild disc space narrowing at L3-L4, L2-L3, and T9-T10.  Tr. at 222.  There was no sign of disc herniation.  The MRI also detected two images at the L1 level which the interpreting physician believed might be areas of edema or fluid collection.  He recommended clinical correlation of these results.

On December 2, 2002, Mei-Chiew Lai, M.D., examined Barnett in connection with her claim for worker's compensation.  Tr. at 136-40.  Barnett told Dr. Lai that she still had not received physical therapy or epidural injections because she was waiting for approval from worker's compensation.  Barnett also told Dr. Lai that she had stopped working on

4

September 30, 2002 because she was in too much pain.  On October 20, 2002, however, her employer demanded that she come back to work.  Barnett began working as much as her back would allow, about two to three hours a day of light duty, three to four days a week.  According to Barnett, she was then in constant pain of varying intensity in her back and legs, with numbness in her legs.  She also reported stiffness and spasms in her lower back.  These symptoms were more pronounced on the right than on the left.  Barnett reported that she could stand and move on her feet for a maximum of three hours at work, but then she had to lie down to relieve the pain.  She also reported that she could stand in one place or sit for a maximum of one hour.  She did no lifting.  Barnett told Dr. Lai that she was taking Soma three times a day, Lorcet three times a day, Ibuprofen three times a day, and Zanaflex.

Dr. Lai's examination of Barnett revealed that she was five feet tall and weighed 208 pounds.  She found no limitations in the range of motion, tenderness upon palpation, or sensory deficit in Barnett's lower extremities, but there was some muscle guarding of the lumbo-sacral paraspinal muscles and a positive Gaenslen's sign for lumbo-sacral injury, especially on the right.  Straight leg raising from a sitting position was mechanically unremarkable, but Barnett reported pain in performing the operation.  Straight leg raising from a supine position achieved 80○ from the perpendicular.  The doctor found no gross muscle weakness or gross atrophy and normal muscle tone.  Barnett walked without limping and stood on tip-toes without pain, but she reported lower back pain upon squatting.  She walked toe-to-heel in a straight line without losing balance, put on shoes and socks in a sitting position, and had no difficulty getting on and off the examination table.  Barnett did have some difficulty, however, with leaning.  Dr. Lai diagnosed Barnett as

5

suffering from lumbar sprain.  Dr. Lai wrote:

> The current pain symptom is a kind of soft tissue disorder as the sprain of the
> lumbar region.  Based on the information of the injured worker, she has received no
> physical therapy, no chiropractic treatment, no injection or epidural block.  The
> injured worker did receive some of the medication treatment, which appears not to
> be helping.

Tr. at 139.  The doctor believed that although Barnett's treatment up until then had been
reasonable, physical therapy was usually needed in such cases.  In particular, she
recommended ultrasound, range of motion exercises, strengthening and reconditioning
exercises, and aquatic exercises.  She also believed the prescribed three epidural blocks
were reasonable and concluded, "[T]he injured worker should avoid continuous working
until her condition is improving."  Tr. at 140

James R. Wolfe, M.D., administered the first of the prescribed epidural blocks on
February 3, 2003.  Tr. at 143-44.  Barnett reported that she was taking Darvocet in addition
to muscle relaxants but that the muscle relaxants seemed to be more effective.  Dr. Wolfe
found mild paraspinal tenderness in the lower lumbar spine and complaints of pain upon
straight leg raising.  Otherwise, his examination found nothing remarkable.  Barnett
received little relief from the first epidural or from the second, administered on February 18,
2003.  Tr. at 141-42.  Given the failure of the first two epidurals to give Barnett relief, Dr.
Wolfe declined to administer a third.  He noted that Barnett had begun physical therapy,
and he believed that this was a good option, given the failure of the epidural blocks.

Dr. Lundeen examined Barnett on February 18, 2003.  Tr. at 203.  His findings
included limited leg raising; spasms, tenderness, and atrophy in the posterior calf muscles
and posterior and anterior thigh muscles; and a slow gait.  Medication was continued.

Barnett underwent physical therapy from March 10, 2003 through May 1, 2003.  Tr.

6

at 147-57.  Before beginning treatment, the therapist found reduced range of motion in Barnett's trunk, and problems with posture, strength, and gait.  Barnett's therapy sessions took place three times a week for about six weeks and included exercises, electrical stimulation, ultrasound, and massage.  Barnett attended 18 sessions and missed two sessions.  The therapist recommended against continued treatment for lack of progress.

An examination by Dr. Lundeen on May 6, 2003 found that Barnett's condition had not improved.  Tr. at 202.  As the medications seemed to be helping Barnett's pain, they were continued.

On May 16, 2003, Dr. Lundeen completed a Medical Report form for the Ohio Bureau of Worker's Compensation.  Tr. at 201.  Dr. Lundeen reported that Barnett was restricted in her ability to stand or walk to 15-20 minute intervals.  He also reported that in an eight hour workday Barnett she could not stand or walk for an hour; could sit for one hour; should never crawl or climb; could occasionally bend, squat, and reach; and could frequently lift or carry up to five pounds and occasionally lift or carry up to ten pounds.  He noted no problems with grasping, manipulation, or pushing and pulling with the arms, but he stated that Barnett could not repetitively use leg controls.  He opined that Barnett's condition would last about six months.

Barnett visited Dr. Lundeen on July 15 and October15, 2003 and January 9, March 6, May 1, June 26, August 18, October 14, and December 9, 2004 with no improvement in her condition.  Tr. at 193-200.  On October 15, 2003 and March 6 and December 9, 2004, he recommended exercise and cautioned Barnett to take narcotic medication only as needed to avoid dependency.  On December 9, 2004, Dr. Lundeen noted that Barnett's sleep was adversely affected by pain and that her pain was affected by the weather.

7

Dr. Sushil M. Sethi, M.D., examined Barnett on June 9, 2003 at the request of the Bureau of Disability Determination ("Bureau"). Tr. at 159-66. Dr. Sethi noted Dr. Wolfe had diagnosed Barnett as suffering from carpal tunnel syndrome but also said that it did not require surgery. He also noted that although Barnett sometimes had slight incontinence when coughing, she otherwise denied loss of bladder or bowel control, weakness, or paralysis. Barnett was currently suffering from high blood pressure, and her medications included Carisoprodol, Tizanidine, and ibuprofen. Physical examination revealed that Barnett was five feet tall, weighed 208 pounds, and had mild arthritic changes in the knees, although those joints had normal range of motion. There was mild tenderness bilaterally in the lumbar spine but no spasm, swelling, redness, or deformity. The range of motion of the lumbo-sacral spine was limited, and the straight-leg raising test negative at 90-degree hip flexion. There was no evidence of deformities of fingers or of carpal tunnel syndrome. Dr. Sethi concluded, "[T]he claimant's ability to do work-related activities such as sitting, standing, walking, lifting, and carrying and handling objects may be slightly limited." Tr. at 161.

On August 15, 2003, Dr. Lundeen completed a Basic Medical form assessing Barnett's condition. Tr. at 189-90. Dr. Lundeen diagnosed Barnett as suffering from degenerative disc disease and a sprain in the lumbar region. He gave her health status as poor but stable. Dr. Lundeen opined that Barnett could stand or walk four to six hours in an eight-hour workday, but for only 30-45 minutes without interruption. He also opined that Barnett could sit for four to six hours in an eight-hour workday, again with no more than 30-45 minutes without interruption. Dr, Lundeen asserted that Barnett could lift up to five pounds frequently and ten pounds occasionally; was moderately limited in her abilities

8

push, pull, or handle objects; and was markedly limited in her abilities to reach or engage in repetitive foot movements.  He considered Barnett to be unemployable.

William B. Schonberg, Ph.D., examined Barnett at the request of the Bureau on September 29, 2003.  Tr. at 167-71.  Barnett reported difficulty sleeping because of bladder problems, trouble gripping due to carpal tunnel, and a low energy level.  She gave her medications as Lorcet and Soma.  Dr. Schonberg found her to be somewhat depressed with restricted affect but otherwise normal.  Barnett reported depression due to her back problems and resulting limitations and due to some problems with memory.  Sensorium and cognitive functioning were in the near average range.  Insight and judgment were adequate.  Barnett did not believe that she needed counseling or that her depression would interfere with her ability to work.    Dr. Schonberg opined that Barnett was mildly impaired in her ability to maintain concentration, persistence, and pace to perform simple, repetitive tasks and in her ability to withstand the stress and pressures associated with day-to-day work.  He did not find any other mental limitations.  He also opined that Barnett had, at least, the mental ability to perform simple tasks.

Dr. Lundeen completed a medical source statement on October 7, 2003.  Tr. at 297-303.  He described the history of his treatment of Barnett and concluded with a physical capacity evaluation.  According to Dr. Lundeen, Barnett could lift or carry five pounds frequently and ten pounds occasionally; could stand or walk for three hours in an eight-hour workday or for 10-15 minutes without interruption; could sit for three hours in an eight-hour workday or for 10-15 minutes without interruption; could never climb, balance, stoop, crouch, kneel, or crawl; was limited in her abilities to reach, feel, push, or pull; and must avoid heights, moving machinery, temperature extremes, humidity, and vibration.  He

9

added the following:

> On the basis of the medical history and all medical information available at this time to this examiner, the findings on physical examination(s) being both subjective and objective, it is my opinion that Ms. Barnett is unable to work. There is no expectation of recovery from her injuries. The natures and extents or her injuries are more than sufficient to permanently remove her from the industrial workplace setting. Moreover, I opine that she has no potential for retraining.

Tr. 303.

On October 16, 2003, a state agency physician reviewed Barnett's record and completed a Physical Residual Functional Capacity Assessment. Tr. at 172-79. He listed Barnett's primary diagnosis as degenerative disc disease, her secondary diagnosis as degenerative joint disease, and listed arthritis as another alleged impairment. He opined that Barnett could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk about six hours in an eight-hour workday, sit about six hours in an eight hour workday, and was unlimited in her ability to push or pull. He also opined that she could never climb ladders, ropes, or scaffolds but was otherwise had no postural limitations. Robert A. Weisenburger, M.D., affirmed these opinions on October 16, 2003.

An x-ray taken on January 20, 2005 revealed a slight convex lumbar curve which could be due to scoliosis or soft tissue spasm. Tr. at 254. It also revealed mild degenerative changes, mild disc narrowing at L-3-L4, L4-L5, and L5-S1 consistent with Barnett's age, and moderate degenerative changes at the sacroiliac joints.

C.    *Hearing testimony*

At the hearing, Barnett testified that she was five feet and one-half inch tall and weighed 204 pounds. Tr. at 321. She declared that she was still seeing Dr. Lundeen about every two months and that his treatment consisted of examining her and prescribing

10

medication for pain and spasms.  Tr. at 323.  Barnett told the court that her primary pain and spasms are in her lower back and that this causes pain and spasms in her neck, shoulders, and legs.  Tr. at 324-25.  She reported that she experienced spasms almost every day.  Barnett testified that she did more sitting than standing and that she could sit for 20 to 30 minutes at a time, although she has to change position frequently.  Tr. at 325.  She said she was able to be on her feet for 20 to 30 minutes continuously at the most. According to Barnett:

> My back gets so stiff that I just -- I almost drop to the floor.  Even shopping, I have to lean or kind of sit and lean against a freezer or something like that for a few minutes until the stiffness goes away to where otherwise my legs just like they don't want to move.  They don't want to carry me.

Tr. at 325.  She testified that she could lift a gallon of milk, did not use a cane, and could walk about 100 feet before her back began to stiffen.  Tr. at 325-26.  She described her medications as including an inhaler of Advair, an inhaler of Singulair, and Albutrol and stated that no doctor had advised her to have psychological counseling.  Tr. at 326, 330.

Barnett stated that she usually cooks, cleans, does dishes, vacuums, dusts, and shops in short bursts with rests in between.  Tr. at 327-28.  She also testified that she leaves the house about once a week and drives as much as 40 minutes in a single trip.  Tr. at 328-29.  Barnett said that she reads and watches some television.

Barnett explained that she worked on and off  after she was hurt because her boss told her that she would be fired if she didn't work.  Tr. at 332-34.  She went on temporary light duty but eventually found that she could not do that because of the lifting and the requirement that she stand.  She finally stopped working at the direction of Dr. Lundeen.

The VE testified that Barnett's past relevant work as a cook was a skilled occupation

performed at the medium exertional level.  Tr. at 334-35.  The ALJ asked the VE to assume a person of Barnett's age, education, and past relevant work and to assume that such a person could, with normal breaks, sit for six hours in an eight-hour day; stand for six hours; walk for six hours; lift and carry 25 pounds frequently and 50 pounds occasionally; could not climb ladders, ropes, or scaffolds; could not work at unprotected heights; and "limited to frequent stooping, kneeling, crouching, and crawling . . . ," tr. at 335, and asked if such a person could perform Barnett's past relevant work.  The VE's response was inaudible. The VE also testified that some heavy pushing or pulling would not affect the categorization of the job.  When the ALJ asked whether the person in the hypothetical could perform Barnett's past relevant work if the person had to rest for ten minutes after standing for 30 minutes.  The VE said that the person could not do that work.  The VE did, however, list a number of other jobs that such a person could perform at the light and medium levels with that requirement for resting.  Tr. at 336-38.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by

way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R.  §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

## IV.  Summary of Commissioner's Decision

In relevant part, the ALJ made the following findings:

1.    The claimant met the special earnings requirements of the Social Security Act on December 13, 2002, the date she stated she became unable to work, and continues to meet them through December 31, 2007.

2.    The claimant has not engaged in substantial gainful work activity since December 13, 2002.

3.    The claimant has impairments that are best described as degenerative disc disease of the lumber and thoracic segments of the spine, and nonsevere asthma.  Together, the impairments are "severe" by Social Security definition.

4.    The claimant's impairments, whether considered separately or together, do not meet or equal the level of severity described in the Listing of Impairments of Appendix 1, Subpart P, Regulations No. 4.

5.     The claimant has the residual functional capacity to perform work-related activities as follows:  She can lift and carry 25 pounds frequently and 50 pounds occasionally and she can sit, stand, and walk for six hours (each) in an eight-hour workday.  She can stoop, kneel, crouch, crawl, and climb stairs frequently and she can occasionally climb ladders, ropes, or scaffolds.

6.     The claimant's past relevant work as a fast food cook did not require the performance of work-related activities precluded by the above mentioned limitations.

7.     The claimant's impairments do not prevent her from performing her past relevant work.

8.     The claimant is not under a "disability" as defined in the Social Security Act, at any time through the date of this decision.

Tr. at 31.

The ALJ adopted the opinion of the state agency physicians in establishing Barnett's

residual functional capacity.  In rejecting the physical functional capacity assessment of Dr.

Lundeen, the ALJ wrote as follows:

Unfortunately, the objective findings do not allow me to accept the opinion of Dr. Lundeen.  In the discussion above, I noted some significant discrepancies between the reports of Dr. Lundeen and those of Dr. Sethi and Dr. Lai.  These inconsistencies reduce the weight to be afforded to Dr. Lundeen's opinions.  This is because of the lack of specific information provided by this treating source.  For example, there is no quantification of the atrophy of the claimant's thigh or calf measurements, and there is no indication as to where the muscle weakness is, specifically.  Also, there is some indication that Dr. Lundeen believes a cane to be obligatory.  The claimant does not use a cane, and according to her testimony, has never used one.  It is also interesting to note that Dr. Lundeen found the claimant's straight-leg raising to be positive at 5-10 degrees before she even stopped working, and as much as 35 degrees thereafter.  Even though the findings of Dr. Lundeen are often repeated, the mere statements regarding the presence of these findings cannot stand against the specific evidence provided by Dr. Sethi and Dr. Lai.  No atrophy was observed by either of these examining sources, and the claimant's strength, sensation, and reflexes were preserved.  Those examining physicians found straight leg raising to be only mildly positive in one instance.  Based on this, Dr. Sethi wrote that the claimant's ability to do work was "mildly limited".  The State Agency reviewing physicians incorporated this mild restriction into the residual functional capacity set forth at Exhibit 10-F.  Accordingly, there is a sufficient basis for me to decline to afford the opinions of Dr. Lundeen controlling weight, under

14

Social Security Rulings 96-2p and 96-5p.  A greater weight is given to the opinions of Dr. Sethi, Dr. Lai, and Dr. Wisenberger [sic], who reviewed the claim for the State Agency.

It is also interesting to note that the degenerative changes documented in this record are considered to be mild by the physicians who initially read the films from the electrodiagnostic tests.  Dr. Lundeen seems to attribute greater functional limitations to these spinal abnormalities than is warranted either by the objective evidence or by the contrary examining source opinion. . . . No surgery has been recommended for the claimant's back impairment, and physical therapy was only sporadically attended.

Tr. at 28.

In discounting Barnett's allegations regarding the level of pain that she experienced, the ALJ wrote, "Her degree of impairment is not such as to reasonably cause the degree of limitation and symptomatology  alleged by the claimant. . . . [T]he claimant's testimony concerning the extent of her limitations was not consistent with the objective medical findings."  Tr. at 28-29.  He also concluded, "[A] careful examination of the longitudinal medical record indicates that the claimant has no 'disabling' physical or mental impairments or limitations whatsoever."  Tr. at 30.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists

15

of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Barnett alleges that the ALJ erred by (1) failing to accord proper weight to the opinion of Barnett's treating physician and (2) conducting a faulty assessment of Barnett's credibility by failing to consider Barnett's documented obesity.

*A.      Whether the ALJ erred in not giving proper weight to the opinion of Barnett's treating physician*

Barnett contends that the ALJ erroneously failed to accord at least significant weight to Dr. Lundeen's opinion.  The Commissioner denies that Dr. Lundeen's opinions were due significant weight.

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner.  *Lashley v. Secretary of Health and Human Servs.,* 708 F.2d 1048 (6th Cir. 1983).  Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2).  This is true, however, only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988).  Where there is insufficient objective data supporting the opinion and there is no explanation of a

16

nexus between the conclusion of disability and physical findings, the factfinder may choose to disregard the treating physician's opinion. *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986). The factfinder must, however, articulate a reason for not according the opinions of a treating physician controlling weight. *Shelman v. Heckler*, 821 F.2d 316 (6th Cir. 1987).

Even when a treating physician's opinion is found not to be entitled to controlling weight, it is still entitled to deference:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling 96-2p, 1996 WL 374188, at *4.

The ALJ's comparison of the observations of Dr. Lundeen with those of Drs. Sethi and Lai deals with aspects of Barnett's condition apparent to any examining source. He notes discrepancies in the reports of Dr. Lundeen compared to the reports of Drs. Sethi and Lai. The ALJ also notes the failure of Dr. Lundeen to give specific information regarding the nature of Barnett's physical limitations. These criticisms of Dr. Lundeen's opinions are supported by the record.

Where the ALJ goes astray is in his in his criticism of Dr. Lundeen's opinions based on objective tests and the nature of Barnett's treatment. Repeatedly, Dr. Lundeen, other treating sources, and Dr. Lai have diagnosed Barnett as suffering primarily from lumbo-sacral soft tissue strain or sprain. Although these physicians have noted degenerative

17

changes in Barnett's spine, those degenerative changes have not been regarded as the primary source of Barnett's back pain and weakness.  Yet, the ALJ criticizes Dr. Lundeen on the basis of his supposed attribution of Barnett's physical limitations to degenerative changes that objective tests show to be mild or moderate.  In addition, the ALJ criticizes the severity of the limitations Dr. Lundeen ascribes to Barnett because no treating source has recommended surgery to deal with her problems.  Again, the ALJ seems to believe that Barnett's problems arise from her degenerative spinal changes, as surgery may be recommended for limitations resulting from certain serious spinal degenerative conditions. There is no reason to believe that physicians would recommend surgery for soft tissue strain or sprain, particularly in light of the assertion of Dr. Liem, Barnett's primary physician, that there was not much a doctor could do for her.  Thus, it seems that the ALJ has made a fundamental error in his understanding of the nature of the physical condition that is producing Barnett's alleged limitations.[1]  Such an error undercuts confidence in the ALJ's opinion that Barnett is not disabled.  It also undercuts the credibility of the state agency physicians who, after reviewing the record, failed to list lumbo-sacral soft tissue strain or sprain as one of Barnett's alleged impairments.[2]

It should also be noted that in criticizing Dr. Lundeen the ALJ made at least two

---

[1]  The ALJ failed to list any kind of back strain or sprain as one of Barnett's impairments, finding only that she suffered from degenerative disc disease of the lumber and thoracic segments of the spine and nonsevere asthma.

[2]  The state agency physicians listed Barnett's primary alleged impairment as degenerative disc disease, her secondary impairment as degenerative joint disease, and arthritis as another alleged impairment.  The ALJ, while generally accepting the opinion of the state agency physicians, said nothing about arthritis or how it might have contributed to Barnett's diminished functional capacity.  This is not a thorough and complete analysis.

18

factual errors.  First, the ALJ erroneously stated that Barnett's physical therapy sessions were "sporadically attended."  Tr. at 28.  Barnett attended 18 of 20 scheduled sessions.  This is not sporadic attendance, and the ALJ's assertion to the contrary is simply wrong.  Second, the ALJ mistakenly states that Dr. Lundeen believed that Barnett was required to use a cane, even though no doctor had prescribed a cane.  The only reference in the record to Barnett's using a cane is in the Physical Residual Functional Capacity Assessment completed by the state agency physicians.  A notation on the form reads, "AP [illegible phrase] to walk ī cane."  Tr. at 176.  The ALJ seems to have interpreted this to mean that "attending physician" believes that Barnett should walk with a cane.  If that is the notation's meaning, then it undercuts the credibility of the state agency physician rather than Dr. Lundeen, as nowhere else in the record is there any indication that Dr. Lundeen believed that Barnett should walk with a cane.

The court cannot say whether the ALJ would have given greater weight to the opinion of Dr. Lundeen if he had not misunderstood the medical basis for Barnett's alleged limitations, or had not been mistaken in believing that Barnett's attendance at physical therapy was merely sporadic, or had not been mistaken in his belief that Dr. Lundeen thought Barnett should use a cane.  Whether these errors with respect to the medical record are sufficient to alter significantly the ALJ's assessment of Dr. Lundeen's opinion is not a matter within this court's purview.  Courts hearing appeals from a decision of the Commissioner do not resolve conflicts in the evidence or decide questions of credibility.  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  This matter must be returned to the ALJ for a proper resolution of the conflicts in the record in light of the court's opinion.

B.      *Whether the ALJ erred in conducting a faulty assessment of Barnett's credibility*

19

Barnett contends that the ALJ erred in his assessment of her credibility because he failed to consider the effects of Barnett's obesity in conjunction with her other medical conditions. The Commissioner replies that (1) Barnett did not claim at the hearing that her obesity aggravated her back condition and (2) "treating and examining physicians found that, despite her obese weight (Tr. 138, 160), she was able to walk with a normal gait (Tr. 138-39, 161), had normal muscle strength, tone, and coordination (Tr. 138, 161, 163-64), and had a normal ability to stand (Tr. 139, 161)." Defendant's Brief, Doc. No. 18, p. 11.

Social Security Ruling 96-7p, 61 FR 34483 describes how to evaluate a claimant's credibility when weighing the claimant's statements about pain. The adjudicator begins by performing a two-step analysis:

> - First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. . . .
> - Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. . . . [A]n individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p, 61 FR 34483 at 34484-85.

20

Social Security Ruling 02-1p, 2000 WL 628049 describes how to evaluate a claimant's obesity.  The Ruling first describes how to determine whether a claimant is obese and how severe any obesity might be:

> These guidelines classify overweight and obesity in adults according to Body Mass Index (BMI).  BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters ($kg/m^2$).  For adults, both men and women, the Clinical Guidelines describe a BMI of 25-29.9 as "overweight" and a BMI of 30.0 or above as "obesity."
>
> The Clinical Guidelines recognize three levels of obesity.  Level I includes BMIs of 30.0-34.9.  Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40.  These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss.

2000 WL 628049 at *2.  At the time of her hearing, Barnett was five feet tall and weighed 204 pounds.  This results in a BMI of 39.818, which places Barnett in the upper part of the range for Level II obesity.[3]

SSR 02-1p, 2000 WL 628049 also describes when the agency will consider obesity in determining whether a claimant is disabled:

> When establishing the existence of obesity, we will generally rely on the judgment

---

[3]  Barnett's BMI is calculated as follows:

1 foot = 0.305 meters ("m"); 5 foot x 0.305 = 1.525 m.  *See* www.tech-faq.com/convert-feet-to-meters/shtml.
1 pound = 0.454 kilograms ("kg"); 204 pounds x 0.454 kg = 92.616 kg.  *See* www.tech-faq.com/convert-pounds-to-kilograms.

Therefore,

BMI = weight in kg/(height in m)$^2$
Barnett's BMI = 92.616 kg/$(1.525 m)^2$ = 92.616 kg/2.326 m = 39.818.

Barnett incorrectly asserts that she suffers from Level III obesity.  *See* Reply, Doc. No. 19, p. 4.

21

of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height. . . . When the evidence in a case does not include a diagnosis of obesity, but does include clinical notes or other medical records showing consistently high body weight or BMI, we may ask a medical source to clarify whether the individual has obesity. However, in most such cases we will use our judgment to establish the presence of obesity based on the medical findings and other evidence in the case record, even if a treating or examining source has not indicated a diagnosis of obesity.

SSR 02-1p, 2000 WL 628049 at *3.

In the instant case, although clinical notes and medical records showed consistently high body weight reflecting upper range Level II obesity, there is no indication that the ALJ asked a medical source to clarify whether Barnett was obese or established obesity on the basis of the medical evidence in the record. Also, there is no indication that the ALJ considered Barnett's obesity in any way in deciding whether Barnett had medically determinable impairments; whether her obesity in conjunction with her other impairments could reasonably be expected to produce her alleged symptoms; and whether Barnett's obesity in conjunction with her other impairments affected the intensity, persistence, and limiting effects of her symptoms to determine the extent to which the symptoms limited her ability to do basic work activities.

The Commissioner argues that Barnett failed to identify obesity as a contributing cause of her back pain at the hearing.[4] The Commissioner cannot expect claimants to diagnose the causes of their symptoms. Ordinarily, that would be the responsibility of a

---

[4] In a letter dated January 5, 2006, Barnett's attorney drew the attention of the ALJ to Barnett's obesity as an aggravating factor in her lumbo-sacral strain and contended that, in combination, her conditions could reasonably be expected to produce her alleged pain. Tr. at 61-62. Thus, even though Barnett's physicians failed to diagnose her as suffering from obesity, Barnett nevertheless asserted obesity as an aggravating factor. There is no excuse for the ALJ's failing to address the issue.

22

treating physician or a medical expert.  But the Regulations provide that even in the absence of a medical diagnosis of obesity, the ALJ will establish the presence of obesity in circumstances such as those in Barnett's case.  The Commissioner may not abdicate his own responsibilities and pass them to Barnett.

The Commissioner also argues that both treating and examining physicians found that despite her obesity Barnett was able to walk with a normal gait, stand normally, and had normal muscle strength, tone, and coordination.  The Commissioner errs.  The Commissioner supports this assertion by referencing the reports of Drs. Lai and Sethi.  Neither of these physicians was a treating physician.  The only report regarding these matters by persons treating Barnett were the reports of Dr. Lundeen and of Barnett's physical therapist.  Both found that Barnett's gait and range of motion were below normal.  In addition, Dr. Lundeen found that her ability to stand for extended periods of time and muscle tone were also affected.

The failure to consider Barnett's obesity in conjunction with her other impairments is particularly problematic given that the ALJ also failed to identify Barnett's primary alleged impairment as lumbo-sacral strain or sprain.  Given the ALJ's failure to consider Barnett's obesity or to identify Barnett's primary alleged impairment, it cannot be said that the ALJ conducted an appropriate assessment of Barnett's credibility regarding the symptoms caused by her impairments.

## VII.  Decision

For the reasons given above, the court vacates the decision of the Commissioner and remands the case for further proceedings.  Upon remand, the ALJ should (1) consider Barnett's allegation of impairment due to lumbo-sacral strain or sprain and its effects, if any,

23

in producing her alleged symptoms; (2) consider Barnett's obesity and its contribution, if any, to her alleged symptoms; and (3) reconsider Barnett's credibility in light of these analyses.  The ALJ's attention is particularly directed toward three objective signs of soft tissue lumbo-sacral injury:  Dr. Lai's finding of muscle guarding of the lumbo-sacral paraspinal muscles, Dr. Lai's finding of a positive Gaenslen's sign for lumbo-sacral injury, and the x-ray taken on January 20, 2005 revealing a slight convex lumbar curve which could be due to scoliosis or soft tissue spasm.

**IT IS SO ORDERED.**


s/ Nancy A. Vecchiarelli
U.S. Magistrate Judge

Date:  July 24, 2008

24